IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**A.J.,**

        Plaintiff,

    v.

**NORTH CLACKAMAS SCHOOL
DISTRICT**,

        Defendant.

No. 3:20-cv-01322-MO

OPINION AND ORDER

**MOSMAN, J.,**

Plaintiff A.J., a minor child, brings six claims against her former school district, largely alleging a racially hostile environment and disproportionate punishment. Defendant North Clackamas School District ("NCSD") filed a Motion for Summary Judgment [ECF 48]. I held oral argument on March 23, 2023. Mins. of Proceedings [ECF 69]. At Oral Argument, I granted summary judgment on two counts and took the other four courts under advisement. *See id.* For the following reasons, I GRANT Defendant's motion as to Plaintiff's peer-harassment theories for Count I (Title VI) and Count II (42 U.S.C. § 1983). I also GRANT Defendant's motion as to Plaintiff's disproportionate-punishment theory for Count I (Title VI). But I DENY Defendant's motion as to Plaintiff's disproportionate-punishment theory for Count II (42 U.S.C. § 1983). Finally, I GRANT Defendant's motion as to Count IV (ORS § 659.852) and both of Plaintiff's theories for Count V (Negligent Infliction of Emotional Distress ("NIED")).

1 – OPINION AND ORDER

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The initial burden for a motion for summary judgment is on the moving party to identify the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is satisfied, the burden shifts to the non-moving party to demonstrate, through the production of evidence listed in Fed. R. Civ. P. 56(c)(1), that there remains a "genuine issue for trial." *Celotex*, 477 U.S. at 324. The non-moving party may not rely upon the pleading allegations, *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995) (citing Fed. R. Civ. P 56(e)), or "unsupported conjecture or conclusory statements," *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). All reasonable doubts and inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

However, the mere existence of "some alleged factual dispute between the parties" will not defeat a motion for summary judgment; there must be "no *genuine* issue of *material* fact." *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 329–30 (9th Cir. 2017) (internal citation omitted). And the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in its favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). This more than a "scintilla of evidence." *Id.* If the evidence is "merely colorable," or is not "significantly probative," summary judgment may still be granted. *Kelly*, 846 F.3d at 329–30.

## FACTUAL BACKGROUND

Plaintiff brought this suit in August 2020 after a tumultuous kindergarten year at one of Defendant's elementary schools. A series of incidents took place involving school discipline that left Plaintiff and her parents believing Defendant displayed racial bias. These incidents, and the

2 – OPINION AND ORDER

school's reaction to them, are recounted below.  They are based on the evidence provided at summary judgment and viewed in the light most favorable to Plaintiff, the non-moving party.

**(1) Playground Conflict**

During her first week of school in September 2019, a student in A.J.'s class refused to play with her, saying that she was "a different color" and "weird."  A.J. Decl. ¶¶ 3–4; Legaard Decl., Ex. L, NCSD ("NCSD")[1] at 52–53.  He kicked her repeatedly and told other kids also not to play with her.  A.J. Decl. ¶ 4; Long Depo. at 97–98, 133.  A.J. told teachers about this student's behavior, but they did not believe her or do anything to stop him.  A.J. Decl. ¶ 7.  Other classmates also said that they wouldn't play with A.J.  *Id.* ¶ 5.  They told her that she was Black, not white. *Id.*

According to Defendant and uncontradicted by Plaintiff, A.J. wanted to play with her classmates, but if they didn't want to play with her, she would be upset with them, "be in their face," and push them.  Bell Depo. at 25–26.  Defendant also points to the fact that the particular student who A.J. alleges kicked her had a special education diagnosis.  Long Depo. at 96–97; Bell Depo. at 29–30.  He always played with the same ball on the playground at the same spot and reacted violently when interfered with by anyone.  *Id.*

In response to this incident, the school forbid A.J. from playing on the asphalt area of the playground where the student bounced his ball.  Long Depo. at 99–100.  She could continue to play on the swing sets and play structures.  *Id.*  NCSD argues this is a common strategy of dealing with incidents on playgrounds and offers evidence that A.J.'s new school has used the same method with A.J.  Vickers Decl., Ex. 5 at 5–6.  A.J. contends the school punished her by doing this

---

[1] "NCSD at" will refer to page numbers in Ex. L, which are labeled as such.  "NCSD" alone refers to Defendant.

and that the school "segregated" the playground.    Jackson Decl. ¶ 14.    When her parents complained, the school lifted playground restrictions on A.J.  Long Depo. at 100.

There is no record of NCSD disciplining the student who kicked A.J. or preventing him from playing in certain places on the playground for this conduct.  NCSD at 2342.  Later that year, this student hit A.J. because she cut him in line.  Vickers Decl., Ex. 8.  For that, his parents were contacted, he received a major disciplinary referral,[2] and he had to miss a recess.[3]  *Id.*; NCSD at 103–05.

### (2) "Poop Hair" Name-calling

Another student in A.J.'s class told her that her hair looked like poop.  A.J. Depo. at 35.  This student also would copy what A.J. would say and tell A.J. that she stinks and that her breath stinks.  Lawrence Depo. at 113.  NCSD staff describe this student as having "very, very serious . . . issues[,]" a diagnosis of "cognitive delay[,]" and "perhaps being on the autism spectrum."  Long Depo. at 45–46; Lawrence Depo. at 114.  And this student also told other people that their hair looked like poop, not just A.J.  Long Depo. at 165.  A.J. contends that the poop hair comment was racist and this student should have been punished but was not.  NCSD staff promised to address the poop hair comment, NCSD at 128, and Plaintiff has offered no evidence that they did not.

---

[2] NCSD has two categories of discipline: majors and minors.  Long Depo. at 51–52.  Majors, like suspensions and referrals, are recorded on a student's permanent record and tracked district-wide.  *Id.*  Minors, for example, behavior tickets, do not go on a student's permanent record and are only tracked on a school-by-school basis, if that.  *Id.*
[3] Although the briefing and cited evidence is not clear, Plaintiff also states that since this was a special education student, his individual education plan ("IEP") should have been amended to protect A.J. from further aggression.  One NCSD staff member testified that this student's IEP team met "many times" with this student, including non-formal meetings.  Long Depo. at 106.  Another staff member said that she didn't "believe that we reevaluated the IEP at any time during the year" but she also "c[ould]n't recall when we met."  Lawrence Depo. at 92.  She did say that she thought there were "casual conversations" like "just a grabbing the resource teacher" to ask "[w]hat else should I be trying?"  *Id.*  That same staff member testified that "when [this student] would become dysregulated," another staff member would come "to remove him out of the classroom so that he didn't be [sic] physical."  *Id.*  The student's IEP already included a daily special education social skills class.  *Id.* at 90–91.

### (3) Negative Descriptions

An NCSD staff member described A.J. as "very aggressive.  She was kind of a bully.  She would pick on others.  She was very loud and disruptive in our classroom."  Coffee Depo. at 17.  That same staff member also described A.J.'s father as "kind of intimidating" and "standoffish."  *Id.* at 18.  Plaintiff argues these descriptions show racial bias on the part of that staff member since other NCSD staff made more positive comments about A.J. and her father.

### (4) Assigned Lunch Seat

NCSD assigned A.J. a specific seat at lunch.  Long Depo. at 143–44.  She was the only student in her class with an assigned seat.  Lawrence Depo. at 37; A.J. Decl. ¶ 10.  A.J. contends that this was punishment and differential treatment.  An NCSD staff member says this was because A.J.

> had a hard time finding a seat in the cafeteria that was agreeable to her.  If she wanted to sit by a particular classmate but that seat was already taken, she would barge her way in between those two students and make herself sit right there, disrupting the whole table.  She would get very upset when certain students wouldn't—didn't sit by her or were already sitting down.

*Id.* at 144.  According to this staff member, the school assigned A.J. a seat at the end of the table and "rotated all the kids that she really liked to sit by . . . to the seat next to her and to the seat across from her so she could still enjoy her friends at lunch."  *Id.*  This system ended the issues that had previously been taking place.  *Id.*

### (5) Kissing/Dropping Harassment

In early October, A.J.'s mother reported to an NCSD staff member that a classmate was chasing A.J. around at recess and trying to kiss her.  NCSD at 76.  The teacher talked with this student about the issue and did not observe any issues after that conversation.  *Id.*  A few weeks later, perhaps in response to continued attempts to kiss her, A.J. picked up this student and dropped him.  Bell Depo. at 54–55.  NCSD staff gave A.J. some sort of referral as punishment and may

5 – OPINION AND ORDER

have contacted A.J.'s parents, NCSD at 100, although the record is unclear and does not show that A.J. received even a behavior ticket.  Plaintiff argues that NCSD punished her disproportionately to the other student, whose parents were not contacted and who did not get any sort of referral for trying to kiss A.J.

### (6) False Accusation of Abuse

A classmate's parent sent an email to NCSD staff saying that A.J. touched this student's "private parts every day at recess and it makes him sad and uncomfortable."  NCSD at 79.  NCSD staff members did not see A.J. "[any]where near" the boy and found it unlikely that A.J. would have been able to do this every day without someone noticing.  NCSD at 73, 78; Bell Depo. at 34.  Nevertheless, Counselor Bell asked A.J. about what happened.  NCSD at 85.  She said she didn't do anything wrong and said that it must have been another student that dressed up like her to get her in trouble.  *Id.*  Plaintiff argues that NCSD staff were quick to accuse and take up the other student's side of the story because of A.J.'s race.  She claims this was disparate treatment.  NCSD staff testify that students being questioned without parent permission or knowledge in similar instances is common.  Lawrence Depo. at 59–60.

### (7) Pencil Sharpening

On October 31, 2019, and November 1, 2019, A.J.'s parents met with NCSD staff over the phone and in person to discuss their concerns about how A.J. was being treated by her peers and the school.  NCSD at 141–42.  A.J.'s father has testified that he and his wife felt that A.J. was experiencing race discrimination.  Jackson Decl. ¶ 26.  On November 6, 2019, A.J. received a written reprimand for sharpening pencils for too long during classroom free time.  Lawrence Depo. at 100–03; NCSD at 139.  A.J. received a "behavior ticket"[4] for this infraction.  NCSD at 139.

---

[4] Behavior tickets are "minors" and do not go on a student's permanent record.  *See* n.2, *supra*; Reggiani Depo. at 105–06.

There were no other consequences.  *Id.*  A.J.'s mother said she was sharpening pencils for her classmates.  A. Jackson Depo. at 45–46.  The behavior ticket says that A.J. received it for "non-compliance" because she "did not follow teacher's directions [to stop sharpening pencils] after 3 reminders."  NCSD at 139.  A.J. contends that this punishment was overly harsh for her wrongdoing.

### (8) Water Spilling Incident

On November 14, 2019, a classmate of A.J.'s spilled water on her at lunch.  A. Jackson Depo. at 41–42; NCSD at 139.  A.J. spilled water on that student in response.  A. Jackson Depo. at 41–42; NCSD at 139; Lawrence Depo. at 38.  For this, she received a behavioral ticket and was sent to the office, missing the rest of her lunch and recess.  NCSD at 111.  The other student had "an equal consequence" and "had to eat lunch in the office that next day" according to one NCSD staff member, Long Depo. at 160, but there is no written documentation that the other student had the same punishment as A.J.  Another staff member who recalls the incident didn't see the other student pour water on A.J.; she just saw A.J. pour water on the other student.  Coffey Depo. at 20, 22–23.

### (9) Hiding after Lockdown Drill

After a lockdown drill on January 23, 2020, A.J.'s teacher noticed several of her students were missing.  Lawrence Depo. at 105–06; NCSD at 140.  A.J. and a few of her classmates had hidden behind a curtain.  Lawrence Depo. at 105–06.  The other students told their teacher that A.J. had tried to keep them from getting out from behind the curtain.  *Id.* at 108–09.  A.J.'s teacher believed the other students and asked A.J. in front of her peers if she had done what they said she did, even though she also admitted that she didn't think it was possible for A.J. to physically

restrain multiple students her same age.  *Id.* at 108–09.  In the end, she punished all of the students who hid with behavior tickets.  *Id.*

**(10) Additional Evidence of Discrimination**

Plaintiff also provides evidence which she says shows a pattern of racism in NCSD schools, but which did not directly involve A.J.  Students in the school district have used the n-word or other racial slurs towards Black classmates.  Utterback Depo. at 9; Pinchon Depo. at 13; Natt Depo. at 22.  There was also an incident at an elementary school in which an instructional assistant made a racist comment to a group of students.  Utterback Depo. at 10.

In addition to these anecdotes, Plaintiff points to statistical evidence.  NCSD uses a survey tool called the "YouthTruth Overall School Experience Survey" to gauge student experience from third grade through the end of high school.  Knoff Decl., Ex. A at 85–89.  The data show that for most cohorts, Black students on average said they felt less welcomed, supported, and respected than their peers did—by about 3%.  *Id.* (subtracting the difference between all students' average rating and Black students' rating for each category and figuring the percent based on the survey's five point scale).

Plaintiff also cites data regarding student punishment.[5]  *Id.* at 101–03.  One data point involves a very specific type of punishment and a very discrete subset of students.  From the 2010–11 school year through the 2020–21 school year (with the exception of one year), there have been disproportionate suspensions over ten days long for students of color with disabilities as compared to other students with disabilities.[6]  *Id.*  Students with disabilities only account for about 17%–

_____

[5] Some of this data was collected pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  Under IDEA, every school district in Oregon is required to provide the Oregon Department of Education data on incidents of discipline in excess of 10 days among students with disabilities across different races and ethnicities.  *See* 34 C.F.R. § 300.170(a).

[6] Plaintiff provides no numerical data as to how great those disparities are.  Plaintiff also does not state what the sample size is across these years.

18% of students at NCSD. *Id.* Plaintiff also provides data for all students, not just those with disabilities, for the 2018–19 and 2019–20 school years. *Id.* This data shows that in 2018–19, 12% of all Black students had one or more suspension, compared to 6% of all students. *Id.* The same numbers for the following school year were 9% and 5%. *Id.*

Plaintiff further points to the lack of data and monitoring as evidence of racial bias by the school. Minor infractions are not tracked on a district level, and they are not intentionally disaggregated by race by administrators on a district level. Reggiani Depo. at 106–08. Instead, individual schools are to make such assessments of their own data. *Id.*; Utterback Depo. at 41. NCSD's former superintendent had no memory of ever disciplining NCSD staff for failing to review such data. Utterback Depo. at 45. But he also never saw any documents indicating that such data was being reviewed. *Id.* at 46. Another school administrator said that she did discuss disaggregated student data with principals, but these discussions didn't occur regularly and only concerned major referrals. Kiltow Depo. at 83. She never asked a school to track data on minors. *Id.* at 54. That same administrator testified that when she was a principal, she did look at discipline data disaggregated by race, even for minors. *Id.* at 84. A.J.'s principal had never done this. Long Depo. at 56. To him, there are so few Black students that it is easy to monitor the data without further analysis. *Id.* Plaintiff points to the fact that this principal had been dismissive of racial concerns in the past. Jones Decl. ¶ 5.

In response, NCSD argues that its staff have attended meetings, been systematically trained, and had conversations on racial bias. Kiltow Depo. at 87–88, 90; Reggiani Depo. at 56–58, 60, 92–93. Furthermore, the elementary school where A.J. attended *did* keep track of minor infractions. NCSD at 2342. That data shows that A.J. was not the most disciplined student in her class, nor was she more disciplined than a white female classmate. *Id.* A.J. does not contest that

she did the misconduct NCSD said she did; she had behavioral issues that merited correction, according to multiple NCSD staff members—and A.J.'s own parents. Bell Depo. at 24–26; Lawrence Depo. at 17–20; NCSD 141. A.J. continues to have similar issues at her new school. A.J. Depo. at 13–14; A. Jackson Depo. at 48 & Ex. 15; Vickers Decl. at Ex. 7. And NCSD contends that they tried to better protect A.J. from any harm by her classmates, including by hiring an additional assistant to help supervise recess. Long Depo. at 143, 172–73. As to the statistics, NCSD argues that they do not show that students are receiving different consequences for engaging in the same behaviors—which is what A.J. alleges, in part.

## DISCUSSION

### A. Counts I & II

Plaintiff's first claim is under Title VI. Title VI prohibits racial discrimination in any program that receives federal funding, which includes NCSD. 42 U.S.C. § 2000d.

Plaintiff contends that she was "subjected to harassment, discrimination, and disparate treatment" on the basis of her race. First Am. Compl. ("FAC") ¶ 82. This treatment "created a racially hostile environment" that was so severe and pervasive "as to significantly alter the conditions of Plaintiff's educational environment, thereby denying Plaintiff equal access to the school's resources and opportunities." *Id.* ¶¶ 83–84. According to the complaint, NCSD had actual knowledge of this "harassment, discrimination, and disparate treatment" but failed to take steps to prevent further misconduct. *Id.* ¶ 85. "Additionally," the complaint contends "NCSD . . . unfairly punished" A.J based on her race. *Id.* ¶ 86.

Plaintiff's second claim is under 42 U.S.C. § 1983. She claims she was denied constitutional equal protection by NCSD's discrimination based on race.

The FAC's allegations with regard to Count II are similar to Count I. Plaintiff alleges that "NCSD's actions . . . in unfairly punishing" and "failing to prevent relentless bullying" of A.J. because of her race violated the Constitution's Equal Protection Clause.

As advanced by Plaintiff in her briefing and at oral argument, each of these claims allege a similar pair of underlying legal theories. The first theory advanced under both claims is that A.J.'s *peers* created a racially hostile environment that NCSD knew of but failed to take steps to remedy. I will call this the peer-harassment theory. The second theory advanced under both claims is that NCSD itself discriminated against A.J. by punishing her more for the same misconduct as her peers because of her race. This can include punishment for conduct that her classmates were not punished for at all, or greater punishment than a classmate when both engaged in the same type of misconduct. I will call this the disproportionate-punishment theory.

Because the relevant legal standards may differ even when the same conduct is at issue, *cf. Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58 (2009), I address each statute and theory separately, although there is some overlap.

**(i) Title VI Peer-Harassment**

The Ninth Circuit recognizes peer-harassment claims under Title VI at least since *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1032–35 (9th Cir. 1998). Although some aspects of *Monteiro* have been abrogated by the Supreme Court's holding in *Alexander v. Sandoval*, 532 U.S. 275 (2001), its recognition of peer-harassment claims remains good law. *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., OK*, 334 F.3d 928, 932 (10th Cir. 2003) (discussing *Monteiro* and *Sandoval*); *Chen Through Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 722 (9th Cir. 2022) (acknowledging that the failure of a school to respond to harassment "might have exposed it to

potential liability on the theory that it had 'failed to respond adequately' to a 'racially hostile environment' of which it had become aware" and citing *Monteiro*).

As *Bryant* recognizes, the Supreme Court's decision in *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), sets out the elements that apply to a Title VI peer-harassment claim. *Bryant*, 334 F.3d at 934; *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (explaining why Title XI cases, including *Davis*, are relevant to Title VI cases). To succeed on a peer-harassment claim, a plaintiff must show that a school district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment of the plaintiff (4) that was so severe, pervasive, and objectively offensive that it (5) deprived the plaintiff of access to the educational benefits or opportunities provided by the school. *Bryant*, 334 F.3d at 934 (citing *Davis*, 526 U.S. at 650).

Two key elements here are (2) deliberate indifference and (4) the severity, pervasiveness, and offensiveness of the harassment. To be deliberately indifferent, school administrators must respond to known peer harassment in a manner that is "clearly unreasonable." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135 (9th Cir. 2003). The Ninth Circuit has held that this "is a fairly high standard" and that a "negligent, lazy, or careless" response will not be considered deliberately indifferent. *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1105 (9th Cir. 2020). And while school officials cannot "make the intentional choice to sit by and do nothing" after being "made aware of egregious forms of intentional discrimination," they do not have a "duty to seek out and discover instances of discrimination or risk being held liable for intentional discrimination." *Bryant*, 334 F.3d at 933.

Similarly, the severity, pervasiveness, and offensiveness of the harassment must be fairly high for a plaintiff to succeed. For example, in one case, a principal "chose to take no action" at a

school where "racial slurs, epithets, swastikas, and the letters 'KKK'" were "inscribed in school furniture and in notes placed in African American students' lockers and notebooks" and students "were allowed to wear T-shirts adorned with the confederate flag, swastikas, KKK symbols, and hangman nooses on their person and their vehicles." *Id.* at 931–33. In another case, plaintiffs were "repeatedly" called the n-word and other racial slurs, and "these insults were scrawled about the school in the form of graffiti." *Monteiro*, 158 F.3d at 1032. *See also Chen*, 56 F.4th at 711–12 (discussing students who created and shared racially offensive social media posts, including edited pictures of Black students with nooses around their necks, pro-KKK messaging, and comments such as "bringing a rope to school" and calling Black students the n-word and "gorillas").

When A.J.'s Title VI peer-harassment claim is viewed in the light of this caselaw, it is clear that the severity, pervasiveness, and offensiveness of any harassment A.J. experienced do not meet the requisite standard. Plaintiff's summary judgment evidence is that two students with learning disabilities made arguably racially insensitive comments to her: that she was "Black, not white," and that she had "poop hair." While these comments were unkind, they do not rise to the all-encompassing, blatantly targeted racial harassment found in other cases. Likewise, NCSD was not indifferent to these comments. There is no evidence that any NCSD staff member knew about the first comment until this litigation, because the only evidence of it is found in Plaintiff's own declaration. NCSD cannot be liable for that of which it did not have actual knowledge. As to the second comment, NCSD staff stated they would take steps to address it, and Plaintiff has proffered no evidence to show that was not the case.

### (ii) § 1983 Peer-Harassment

Plaintiff's § 1983 peer-harassment claim is similar to her Title VI peer-harassment claim. A.J. alleges that in failing to prevent her classmates from bullying her, NCSD treated her differently from white classmates.

To establish a § 1983 claim premised on a violation of the Constitution's Equal Protection Clause, a plaintiff must show that the defendant, acting under color of state law, discriminated against her as a member of an identifiable class, and that the discrimination was intentional. *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). When a plaintiff alleges a § 1983 claim against a local governmental entity—a *Monell* claim—she must make several additional showings beyond the constitutional violation. She must also prove that (1) the entity had a policy; (2) the policy amounted to a deliberate indifference to her constitutional right; and (3) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001). The policy need not be a formal policy approved by the entity's official decision-making channels. *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010). But it must be a "permanent and well-settled practice"; proof of "random acts" or "isolated events" are insufficient to establish an unofficial policy. *Id.*

Here, Plaintiff cannot show that the school had a policy of failing to protect A.J. from bullying that amounted to deliberate indifference. The two incidents discussed in the prior section, along with the kissing incident, at most amount to "random acts" or "isolated events" of NCSD insufficiently punishing or failing to punish some misbehavior. They are inadequate to establish an unofficial policy. And although Plaintiff has offered evidence of a few other instances of racist

conduct by students, a handful of problems in a district of 17,000 students and 2,000 staff members, Utterback Depo. at 9., is not enough to establish a "permanent and well-settled practice."

For both the Title VI and the § 1983 claim, Plaintiff urged me at oral argument to look at the subjective effect on her when considering how severe, pervasive, and offensive her school environment was and the level of indifference NCSD displayed. But in fact, the proper inquiry is both subjective and objective. *See, e.g.*, *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 687 (9th Cir. 2017) (stating that a hostile work environment must be both subjectively and objectively hostile). It is undisputed that the environment was subjectively hostile to A.J., and no one seeks to discount her lived experience. However, I must look to the facts of the harassment and ask whether the environment was so hostile "from the perspective of a reasonable person belonging to the plaintiff's racial or ethnic group," *id.*, that it deprived A.J. of access to the educational benefits or opportunities provided by the school.[7]  Applying that standard, especially against the background of the cases cited above, I cannot find for Plaintiff.

Furthermore, the Supreme Court has explicitly counseled against making findings of hostile school environments in the context of very young children. In *Davis*, the Court cautioned with regard to gender bias that

> early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education . . . .

---

[7] I note that this standard is different from Count IV, which asks me to examine whether the *school's* actions—not the harassment of her peers—"substantially disadvantaged" A.J. As discussed below, that count does not require me to compare A.J.'s punishments to those of her peers.

*Davis*, 526 U.S. at 651–52.  Similarly, the Ninth Circuit has indicated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) are not sufficient to create an actionable claim."  *Reynaga*, 847 F.3d at 687.  The wisdom of these holdings in the context of kindergarteners seems self-evident.

Plaintiff's Title VI and § 1983 peer-harassment claims therefore fail, and I grant Defendant summary judgment on these claims as to this theory.

### (iii) Title VI Disproportionate-Punishment

Plaintiff's Title VI and § 1983 disproportionate-punishment claims begin with the same analysis.  A plaintiff must show that a defendant's actions "had a discriminatory impact, and that [the] defendant[] acted with an intent or purpose to discriminate" based upon plaintiff's "race, color, or national origin."[8]  *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1242 (9th Cir. 2021); *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 702–03 (9th Cir. 2009).  A key element of both claims is the showing of intentional discrimination.[9]  *Yu*, 15 F.4th at 1242.

For Title VI cases, a factfinder should consider all the evidence and look to the "totality of the relevant facts" to determine whether the defendant has engaged in intentional discrimination.  *Id.*  This evidence may be direct or indirect.  *Rashdan v. Geissberger*, 764 F.3d 1179, 1183–84 (9th Cir. 2014).  Direct evidence is evidence which proves discrimination without any inference.  *Id.*  Indirect evidence may consist of statistics and comparators from which intentional discrimination may be inferred.  *See id.*  Such indirect evidence may be especially useful when the defendant's challenged conduct is facially neutral.  *Comm. Concerning Cmty. Improvement*, 583 F.3d at 702–03.  "Gross statistical disparities" alone can satisfy the intent requirement, but it is a

---

[8] Title VI also requires proof that a defendant discriminated in the context of a program that receives federal funding, but it is undisputed that NCSD receives federal funding.

[9] This element differentiates these cases from disparate impact cases that do not show intent and which are not actionable.  *See Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 736 (9th Cir. 2021); *Bryant*, 334 F.3d at 932.

"rare case" where those disparities show an "invidious or discriminatory purpose." *Id.* In nearly all cases, differential impact alone will not be determinative. *Id.* Other forms of indirect evidence may include the historical background of the allegedly discriminatory decisions, the events leading up to the decisions, and any other relevant history. *Id.*

The Ninth Circuit has held that the *McDonnell Douglas* burden-shifting framework applies to Title VI disparate treatment claims like A.J.'s disproportionate-punishment claim. *Rashdan*, 764 F.3d at 1182. This means that even if a plaintiff can prove a prima facie case using the methods just described, the defendant has an opportunity to articulate legitimate, nondiscriminatory reasons for the challenged conduct. *Id.* If the defendant succeeds in articulating such reasons, the plaintiff then must show that these reasons were "not true" and only a "pretext for discrimination." *Id.*

In this case, viewing all of the relevant facts in the light most favorable to Plaintiff, A.J. can make out a prima facie case of disproportionate punishment. On the playground, she was forbidden to play where the student who kicked her played; a similar restriction was not placed on him. Despite evidence that other children had difficulty behaving at lunch, only A.J. was assigned a seat—even if she got to pick who sat with her. A.J. was punished for picking up a classmate and dropping him when he was not punished for repeatedly attempting to kiss her. She was punished with a behavior ticket for sharpening a pencil for too long and not listening to her teacher. Other students were mostly punished in this manner for physical aggression towards their classmates. *See* NCSD 2342. And while NCSD staff say they punished the other student equally for the water-dumping incident, A.J. pointed out at oral argument that there is no record of this punishment in the places and forms where such records would usually be kept. Finally, even in the hiding incident in which all of the students were punished the same, A.J.'s teacher believed A.J. to be the ringleader of the misconduct and showed that by asking her about it in front of her peers.

These facts are enough to show that A.J. experienced differential treatment; she also can make out a prima facie case to infer that the differential treatment was intentional and based on race. A.J. was the only Black student in her class. And she was among the most punished of her classmates. This is coupled with the limited, but existent, anecdotal history of racial incidents in NCSD schools. Furthermore, statistical evidence shows that Black students were suspended at a rate nearly double that of students on average. This statistic is somewhat limited in that it only covers suspensions, which involve a small number of students. It is also only derived from two years of data. Nevertheless, it is still probative and supports Plaintiff's case. In addition, NCSD administrators do not appear to have closely monitored whether Black students were punished more than other students, despite saying they were watching for such disparities. All these facts together provide indirect evidence of disproportionate punishment based on race to make out a prima facie case.

However, NCSD has also successfully articulated a single legitimate, non-discriminatory reason for all of the conduct A.J. challenges. In every instance, A.J. broke the rules. She got in students faces and pushed them when they wouldn't play with her on the playground. She was disruptive in the cafeteria at lunch. She didn't follow teacher directions. She inappropriately picked up and dropped a classmate. She hid. Teachers have a degree of discretion when it comes to punishment, and these punishments were not outside the realm of what was appropriate. In no instance did A.J. receive any sort of major referral or mark against her permanent record for her conduct. And most instances involved the lowest degree of discipline available. Even if the punishments were not exactly the same across all children, they were not so out of proportion to show *intentional* racial bias on the part of the school district.

A.J. offers no proof that this non-discriminatory reason was pretextual. And there is nothing in the record to indicate otherwise. As such, I grant NCSD's motion as to A.J.'s Title VI disproportionate-punishment claim.

### (iv) § 1983 Disproportionate-Punishment

The analysis for § 1983 disproportionate-punishment claims begins the same as for Title VI disproportionate-punishment claims. A plaintiff must show that a defendant took action to intentionally discriminate against a plaintiff based on the plaintiff's race and that those actions had a discriminatory impact. *Comm. Concerning Cmty. Improvement*, 583 F.3d at 702–03; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Like Title VI claims, conduct that is facially neutral may show intent to discriminate in rare cases where statistical disparities are "stark." *Id.* And courts may also look to the same other forms of evidence as in Title VI claims to show intent to discriminate, including the historical background of the decisions, the specific sequence of events leading to the challenged actions, and any departures by the defendant from normal procedures. *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015).

Significantly different from Title VI claims, however, is the fact that the *McDonnell Douglas* burden-shifting framework does not apply to § 1983 claims. Instead, the bar is much lower. A plaintiff only needs to prove that a discriminatory purpose was a "motivating factor" for a defendant's challenged actions. *Arce*, 793 F.3d at 977. The Ninth Circuit has held that for § 1983 claims, "very little evidence" showing "any indication" of discriminatory motive may be enough to raise a "genuine issue of fact" that can "only be resolved by a fact-finder." *Id.* at 977–78.

Like her § 1983 peer-harassment claim, A.J. has pled *Monell* liability and so must prove additional elements beyond the constitutional violation for her § 1983 disproportionate-punishment claim. As discussed above, Plaintiff must offer proof of a district-wide policy that

was the moving force behind NCSD's constitutional violation and that amounted to deliberate indifference to A.J.'s constitutional right that was violated. *Mabe*, 237 F.3d at 1110–11. Again, the policy need not be official, but it must be a permanent and well-settled practice and not merely random acts or isolated events. *Thompson*, 885 F.2d at 1443–44.

The lower bar for § 1983 disproportionate-punishment claims as compared to the same claims under Title VI makes all the difference here. Applying the law to the facts of this case, A.J.'s § 1983 disproportionate-punishment claim survives summary judgment. The discussion of A.J.'s prima facie Title VI disproportionate-punishment claim above clears the bar of supplying "very little evidence" to provide "any indication" such that a rational jury could find that a discriminatory motive was *a* motiving factor for NCSD's actions. And taking every inference in favor of A.J.—as I must do at summary judgment—her statistical evidence, historical anecdotes, and other proofs are enough for a factfinder to be able to conclude that there was an unofficial district-wide policy of ignoring race-based disproportionate punishment. That same factfinder could conclude that the unofficial policy amounted to deliberate indifference and was the moving force behind any violation by NCSD of A.J.'s constitutional right to be free from disproportionate punishment based on race.

I therefore deny NCSD's motion for summary judgment as to A.J.'s § 1983 disproportionate-punishment claim. Count II survives summary judgment on this theory alone.

## C. Count IV: ORS § 659.852 (Retaliation)

A.J.'s fourth claim is under ORS § 659.852. This statute prohibits a school from retaliating against a student who reports information that the student believes is evidence of a violation of state or federal law. ORS § 659.852(2). Retaliation is specifically defined, as relevant here, as the "denial of academic . . . opportunities," the "exclusion from academic or extracurricular activities,"

or "other adverse action that substantially disadvantages a student in academic . . . or extracurricular activities." ORS § 659.852(1)(b). There is no binding caselaw from Oregon appellate courts or the Ninth Circuit interpreting this statute.

In the FAC and at oral argument, A.J. contends that she was retaliated against after her parents met with NCSD staff in early November 2019. At that meeting, they told NCSD staff that they felt A.J. was being racially discriminated against. After that meeting, A.J. received three behavior tickets: for the pencil-sharpening incident, for the water-dumping incident, and for the hiding incident. For the pencil-sharpening incident, A.J.'s parents were contacted. For the water-dumping incident, A.J. missed lunch and recess for a day. For the hiding incident, A.J.'s parents were contacted.

For Plaintiff's disproportionate-punishment claims, I must compare A.J.'s punishment to her peers to determine if they were unequal. But here, the statute merely asks me to consider whether NCSD's actions "substantially disadvantaged" A.J. As with the peer-harassment claims, the standard that must be met is both objective and subjective. And I cannot say that objectively, A.J. was substantially disadvantaged in an academic or extracurricular manner by missing lunch and recess for one day. Even in total, Defendant's actions here had no impact on her permanent record or her progress in school. True, A.J.'s response to her experiences was significant. But the law instructs me to consider whether Defendant's actions directly disadvantaged A.J., not whether A.J.'s feelings about what happened caused her to suffer in school. To do otherwise would be to have retaliation claims stand or fall based on variations in the way five-year-olds experience reprimands from their teachers. So even assuming that Plaintiff has shown—based on the close timing between her parents' meeting and the three behavior tickets—that NCSD was attempting

to get back at her, NCSD's actions do not rise to the statutory definition of retaliation. The punishments did not substantially disadvantage A.J.

As such, I grant summary judgment to NCSD on Count IV.

**D. Count V: NIED**

Plaintiff's fifth claim and the final one at issue here is for NIED. In the FAC, A.J. simply alleges NCSD "had a duty to provide Plaintiff with an educational atmosphere free of race discrimination" and failed to take adequate steps to do so. FAC ¶¶ 112–13. As a result of this negligence, Plaintiff alleges she suffered physical injury and emotional distress. FAC ¶ 114. Presumably, although not stated anywhere in the FAC, this claim is in the alternative to Plaintiff's other claims, which allege intentional conduct by NCSD.

Although this claim is labeled an NIED claim, in Oregon, a "claim" for NIED is simply a common law negligence claim in which the plaintiff seeks damages for emotional distress. *See Achcar-Winkels v. Lake Oswego Sch. Dist.*, No. 3:15-CV-00385-YY, 2017 WL 9084984, at *25 (D. Or. Feb. 21, 2017), *report and recommendation adopted in part, rejected in part*, No. 3:15-CV-00385-YY, 2017 WL 2291338 (D. Or. May 25, 2017) (Mosman, J.). To prevail on an Oregon negligence claim, a plaintiff must prove that there existed special relationship that "creates, defines, or limits the defendant's duty" such that the breach of such a duty is actionable. *Id.* at 2017 WL 2291338, *5. Alternatively, a plaintiff can make a claim under the "general foreseeability standard," which requires that the plaintiff show "(1) that defendant's conduct caused a foreseeable risk of harm; (2) that the risk is to an interest of a kind that the law protects against negligent invasion; (3) that defendant's conduct was unreasonable within the class of persons, and plaintiff's injury was within the general type of potential incidents and injuries that

made defendant's conduct negligent." *Doe ex rel. Farley, Piazza & Assocs. v. Gladstone Sch. Dist.*, No. 3:10-CV-01172-JE, 2012 WL 2049173, at \*11 (D. Or. June 6, 2012) ("*Gladstone*").

To recover negligently inflicted emotional distress damages, a plaintiff must make one of two additional showings. *Id.* at \*12. She can either show physical injury that gave rise the emotional distress, or prove infringement upon a legally protected interest that stems from a special relationship. *Id.*

Here, Plaintiff seeks to recover emotional distress damages. As such, she must make the typical negligence showings as well as one of the two additional showings. Even assuming proof of negligence, Plaintiff cannot make either of the additional showings.

In the FAC and her briefing, Plaintiff alleged physical injury caused by NCSD's failure to provide an environment free of racial discrimination. At oral argument, Plaintiff argued that her physical injury was the kicking she received from the student on the playground. There are at least three problems with this. First, while Plaintiff has offered proof that she was kicked, she has offered no proof of injury from the kicking—not so much as a bruise or a cut. Second, this incident occurred during the first week of school, before any of NCSD's alleged failures to protect Plaintiff. NCSD's failure to protect therefore could not have caused physical harm from the kicking, even if proof of injury were provided. Third, given my decision on Plaintiff's peer-harassment claims, I cannot logically find that NCSD's failure caused the harm.

This last reason applies equally to any claims based on an infringement of a legally protected interest stemming from a special relationship. I have previously held that the Oregon Supreme Court "would likely recognize a special relationship between a public school and a public school student." *Achcar-Winkels*, 2017 WL 2291338, at \*4. However, even supposing that special relationship, *cf. Curtis v. MRI Imaging Servs. II*, 148 Or. App. 607, 620 n.11, *affirmed*, 327 Or. 9,

956 P.2d 960 (1998), and the finding of a legally protected interest in being free from racial discrimination in schools, *cf. Phillips v. Lincoln Cnty. Sch. Dist.*, 161 Or. App. 429, 433 (1999), I have already determined that Plaintiff has not offered enough evidence at summary judgment to sustain a case that NCSD breached that duty through peer-harassment.[10] *See Gladstone*, 2012 WL 2049173, at *13–14.

As such, I grant summary judgment on both Plaintiff's physical injury and special relationship theories for Count V.

## CONCLUSION

For the reasons stated above, I GRANT IN PART and DENY IN PART Defendant's Motion for Summary Judgment [ECF 48]. I GRANT Defendant's motion as to Plaintiff's peer-harassment theories for Count I (Title VI) and Count II (42 U.S.C. § 1983). I also GRANT Defendant's motion as to Plaintiff's disproportionate-punishment theory for Count I (Title VI). But I DENY Defendant's motion as to Plaintiff's disproportionate-punishment theory for Count II (42 U.S.C. § 1983). Finally, I GRANT Defendant's motion as to Count IV (ORS § 659.852) and both of Plaintiff's theories for Count V (NIED).

IT IS SO ORDERED.

DATED this ___6 Th___ day of April, 2023.

MICHAEL W. MOSMAN
Senior United States District Judge

---

[10] Plaintiff's other theory of discrimination—the disproportionate-punishment theory—requires a showing of intent. The same conduct by NCSD that is intentional for the purposes of one count (§ 1983) cannot also be negligent for the purposes of another count (NIED).